LEKTOPHONE CORPORATION v. BRANDES PRODUCTS CORPORATION.

(District Court, D. New Jersey. January 17, 1927.)

1. Patents ⏤312(3)—Payment of royalties by business men, as determining validity of patents, is not substitute for judgment of court.

Action of business men and attorneys in paying royalties, as determining validity of patents, is not a substitute for judgment of court after full hearing.

2. Patents ⏤328—1,271,529, for cone type loud speaker, held invalid, and not infringed.

Patent No. 1,271,529, relating to cone type loud speaker, held invalid, and not infringed.

3. Patents ⏤328—1,271,527, for cone type loud speaker, claims 29 and 30, held invalid.

Patent No. 1,271,527, relating to cone type loud speaker, claims 29 and 30, held invalid.

In Equity. Patent infringement suit by the Lektophone Corporation against the Brandes Products Corporation. Bill dismissed.

Pennie, Davis, Marvin & Edmonds, William H. Davis, and John F. Neary, all of New York City, for plaintiff.

Gifford & Scull and George F. Scull, all of New York City, John B. Brady, of Washington, D. C.. and John Boyle, of New York City, for defendant.

BODINE, District Judge. The patents in suit relate to the cone type of loud speaker, and are United States letters patent 1,271,529 and 1,271,527. The patent application was filed in 1913, and was subsequently divided, and the two patents issued.

The patents were before Judge Campbell, in the Eastern District of New York (11 F.[2d] 421), in Lektophone Corporation v. Sylo Lighting Fixture Company and were held valid. In the case of Lektophone Corporation v. Western Electric Co., Inc., Judge Thacher held the patent 1,271,529 valid, but not infringed, and held claims 29 and 30 of patent 1,271,527 invalid. The Circuit Court of Appeals passed upon both cases (16 F.[2d] 7, 16 F.[2d] 10), and held, without determining the validity of the patents, that the double cone feature of the Western Electric speaker did not infringe either patent.

Claims of patent 1,271,529 in suit are the first seven. No. 4, as follows, is probably as broad as any:

"An acoustic device, comprising a tympanum support having a circular aperture, and a light tympanum freely exposed to unconfined air and having its outer edge rigidly mounted on said support in said aperture; said tympanum having a central conical portion, the base of which exceeds in area one-half the effective area of the said tympanum; the tympanum being of sufficient area to impart to the surrounding free air, when vibrated, sound waves substantially corresponding in intensity to the original sound waves."

The earlier patent, since it is of less importance, will be discussed later. The specifications, so far as pertinent, are as follows:

"This invention relates to instruments which reproduce sounds, and is particularly directed to the attainment of a direct propagation, in free air, from a record or equivalent element subjected to the action of the original sound waves or vibrations, of self-sustaining sound waves substantially corresponding in intensity and amplitude, as well as in pitch or timbre, to the said original sound waves, as distinguished from an initial generation of violent air disturbances in a confined space, and a subsequent transformation of such disturbances into self-sustaining sound waves by means of a megaphone, horn, or other amplifier.

"In the case of a talking machine, the device employed to propagate the regenerated sound waves in air comprises the reproducer or sound box and the horn; but the reproducer alone is incapable of propagating sound waves of the character above stated, because of the fact that the air disturbances which are produced by its diaphragm and which issue through its mouthpiece are almost immediately dissipated in heat or in waves which are not heard at any considerable distance, if the horn be removed. Consequently it is usual in all instruments of the class indicated to employ an amplifier of some sort to resist transformation into heat and to control the lateral form of the wave during a progressive spreading action, which is accompanied by a lessening of the violence of the disturbance until a wave front of great area is attained having a movement appropriate to the sound conductivity of air. In this way, it has been found practicable to transform a satisfactory part of the energy, obtained from a moving record, into self-sustaining sound waves in air; but in every instance such method has been accompanied by distortions of the true recorded sounds in the reproducer, and more particularly in the horn or amplifier, giving rise to those characteristic sounds known as phonograph and horn sounds. These distortions of the true sounds are in a measure impressed upon the record in its making, but

are more noticeable in the reproduction, where a suppression of character and overtones, the loss of timbre in instruments and the voice, and the accentuation of notes of certain pitch, so change the recorded number that a faithful reproduction is not obtained.

"It is the object of the present invention to regenerate the original sounds directly from the record or other element subjected to the action of such sounds, without interposition of a confined body of air and without the employment of a restrictive transformer, such as a horn. According to the invention, the sound regenerator comprises a tympanum of relatively great area freely exposed to unconfined air, in which the sounds are to be propagated; the vibrations produced by the record or its equivalent—that is, the element on which the original sounds or sound waves are recorded, or which is otherwise subjected to the vibrating action of said sounds or sound waves and may, therefore, be termed the 'sound-vibrated' element—being faithfully transmitted to the tympanum in such manner that the latter excites directly in the free air surrounding it, sound waves of an intensity and amplitude substantially corresponding to the original sound waves. In other words, the original sounds are directly regenerated by the vibrating tympanum without the interposition of a restrictive or sound-modifying transformer."

The inventor substitutes for the sound box and horn combination of the early phonograph his sound board, which has many advantages in the faithful reproduction of sound. The device consists of three elements: (1) A rigid support; (2) a large, stiff, light cone of vibratile material; and (3) an annular flexible rim interposed between the two.

The Lumiere device, patents Nos. 986,477 and 1,036,529, is undoubtedly a complete anticipation. Lumiere pleated a paper diaphragm, so that the paper was reversely flexed to form a fanlike series of radially disposed ridges and furrows, and clamped it at its edges to a supporting ring. The device operated in free air and there was no blasting. The most that Hopkins did was to shape his paper another way, and interpose a flexible annular rim between the paper and the supporting rings.

The Lumiere device, when used, produced quite as good a sound as any device shown. Had Hopkins been earlier, no doubt Lumiere, shaping his paper a little differently and omitting the flexible rim, would be held to infringe. "That which infringes, if later, would anticipate, if earlier." Knapp v. Morss, 150 U. S. 221, 228, 14 S. Ct. 81, 37 L. Ed. 1059. Lumiere, however, obtained by his folding a somewhat flexible rim between the stiff central portion and the supporting rings. He had all the elements of the patent in suit, except that his paper was shaped a little differently.

Starling and Cole taught, in an article published in 1907 in the Talking Machine News, that a conical sound board, if large enough, could be substituted for the sound box and horn in a talking machine. The device made in accordance with their teachings worked perfectly, except when excessive power was applied to it, when it blasted at the edges. Of course, in any loud speaker, good results are not obtained if unnecessary volume is applied.

The Brandes cone, used without the rings and with the rubber band free and also turned back, produces an equally excellent result when confined in its cabinet and compared with the article upon the market.

It seems hardly necessary to mention the other prior art patents—Edison, No. 963,362; Lumiere, No. 986,477; Lumiere, No. 1,036,529; English, No. 1,064,062; Lumiere, No. 1,072,477; British Lodge, No. 9,712 of 1898; British, Stroh, No. 9,418 of 1899; British, Stroh, No. 3,393 of 1901; British, Brown, No. 1,157 of 1911; British, Brown, No. 29,833 of 1910; French, Gaumont, No. 331,226 of 1903—except to show that Hopkins was not a pioneer, but entered into a crowded art.

[1] No outstanding commercial success was shown, attributed by the plaintiff to the business conditions prevailing during the war. Further, the mere fact that royalties have been paid demonstrates that those paying may have been unduly timid or sagacious. The action of business men and attorneys is not a substitute for the judgment of the court after a full hearing. Bethlehem v. Churchward (C. C. A.) 268 F. 361.

The decision of the case might just as well rest, however, on the same principle that decided the case in the Second circuit. Lektophone Corporation v. Western Electric Co., supra. The Brandes commercial devices no more operate in the way described in the Hopkins patent than did the Western Electric device (double cone speaker) in that case. The interposed rim of the Brandes device performs a different function. The sound produced is equally good, whether the rim is loose or turned back. The rubber band, loosely connected to the cone and the sup-

porting rings, has not spring action, and does not act as a support to the paper cone, and is no more than a damper to the vibrations caused at the edge of the cone. Finally, the Brandes speakers, 1,000, 1,100, and 1,300, do not operate in free air any more than the Western Electric device did, because a cover is placed over the cone, which tends to confine the air in which the speaker operates. The confined air in the cabinet resonates in the same way that the confined air in a drum resonates when the diaphragm is vibrated.

[2] Patent No. 1,271,529 is invalid and is not infringed.

[3] The patent 1,271,527 is a sound-regenerating means somewhat described in the specifications as follows:

"The 'sound regenerator,' in the case of the present invention, comprises a tympanum of relatively great area freely exposed to unconfined air, in which the sounds are to be propagated, and a mechanical transmission, which faithfully transmits the vibrations produced by the record, to the tympanum, in such manner that the tympanum excites directly in the free air surrounding it sound waves of an intensity or amplitude substantially corresponding to the original recorded sound waves. In other words, the original sounds are directly regenerated by the vibrating tympanum, without the interposition of a restrictive or sound modifying transformer."

Claims 29 and 30, as follows, are in suit:

"29. In a sound-regenerating machine, a vibratile conical tympanum of large area, rigidly supported at its periphery and freely exposed to unconfined air, a sound-vibrated element, and vibration transmission means connecting said element and said tympanum and arranged to impart to the tympanum vibrations which are relatively much shorter than the vibrations imparted to the said element.

"30. In a sound-regenerating machine, a vibratile conical tympanum rigidly supported at its periphery and freely exposed to unconfined air, a sound-vibrated element, and vibration transmission means connecting said element and said tympanum arranged to impart to the tympanum vibrations which are relatively much shorter than the vibrations imparted to the said element, the tympanum having an area sufficiently large to effect, without amplification, sound waves of large volume and carrying power."

These claims are, in part, elucidated by the specifications as follows:

"It will be noted that the distance between the point of the style $q'$ and the axis of the lever $Q$ is greater than the length of the arm $U$ which projects from the center of the lever $R$ and to which the rod $V$ is connected. By reason of this fact, and of the fact that the levers $Q$ and $R$ and the rod links $S$, $S'$ form a parallelogram, the length of vibration of the tympanum is relatively much less than that of the style, and the tympanum thus offers little resistance to the movement of the style, thereby greatly reducing the wear on the record. To compensate for this small movement of the tympanum, its large area enables it to move a large body of air, so as to obtain sound waves of large volume and great carrying power."

Judge Thacher held these claims invalid, in view of the prior art, saying:

"A different conclusion, I believe, must be reached with respect to claims 29 and 30 of patent No. 1,271,527, which cover any vibration transmission means by which the vibrations imparted to the tympanum are relatively much shorter than the vibrations of the sound-vibrated element. The prior art discloses the employment of reducing levers for precisely this purpose in sound box construction. Brown, British patent, 29,-833. The drawings of the Lumiere patent, 986,477, disclose a mechanism which embodies this principle, and a reducing mechanism is physically embodied in the Lumiere device brought to this country in 1909. It is hardly to be supposed that Lumiere embodied a reducing mechanism in his device by accident and without purpose; it is rather to be inferred from his knowledge of the art that he regarded the use of such a mechanism as merely a detail of construction well known in the art. The references to Brown and Lumiere clearly anticipate the claims of patent No. 1,271,527 which are in suit, because it cannot be said to be an exercise of the inventive faculty to apply to a sounding board purely mechanical means for transmitting sound vibrations well known in devices for transmitting similar vibrations to the diaphragm of a sound box or telephone receiver. The reference to Lumiere goes further, and discloses the use of such a mechanism for the reduction of vibrations transmitted directly to a sounding board device, and this as early as 1909. If the Brown patent and the Lumiere device had been called to Judge Campbell's attention, I am confident that he would have reached this conclusion in the Sylo Case."

I concur entirely with his reasoning. But, at all events, Hopkins was working in the phonograph art, and the defendant in

the radio art, and there is a different arrangement of parts and a different method of operation.

The bill will be dismissed, with costs.